## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## (TAMPA DIVISION)

| | |
|---|---|
| JOSEPH M. JASON, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>JINGSONG LI, XUEFENG GUO, WEIHONG XIA, GUANGWU ZHANG, SHUJE WU, ZHOUZHE JIN, INGYONG MA, MORGENSTERN, SVOBODA & BAER, CPA'S, P.C., and DAVID SVOBODA, Defendants,<br><br>-and-<br><br>CHINA ORGANIC AGRICULTURE, INC.,<br><br>Nominal Defendant. | Civil Action:<br><br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:<br><br>(1)  BREACH OF FIDUCIARY DUTY<br>(2)  CORPORATE WASTE<br>(3)  GROSS MISMANAGEMENT<br><br>**JURY DEMANDED** |

Plaintiff respectfully submits this Verified Shareholder Derivative Complaint against Defendants named herein based upon personal knowledge as to his own actions, and as to all other matters, upon information and belief based upon the investigation of counsel.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a shareholder derivative action on behalf of the Nominal Defendant China Organic Agriculture, Inc. ("China Organic" or the "Company") against Defendants Jingsong Li ("Li"), Xuefeng Guo ("Guo"), Weihong Xia ("Xia") Guangwu Zhang ("Zhang"), Shuje Wu ("Wu"), Zhouzhe Jin ("Jin"), and Ingyong Ma ("Ma") (collectively, the "Individual Defendants"), for violations of fiduciary duties owed by them to China Organic, as well as Morgenstern, Svoboda & Baer, CPA's, P.C. ("MS&B") for aiding and abetting the breach of

fiduciary duties alleged herein.   These violations, in turn, have substantially injured the Company.

2.     During the period November 12, 2008 and May 17, 2011 (the "Relevant Period"), Defendant Li served as the Company's Chief Executive Officer, and Defendants Guo and Xia each served as the Company's Chief Financial Officer.  In those roles, these defendants were responsible for instituting and maintaining adequate internal controls relating to China Organic's financial reporting.  Each of these defendants filed certifications with the United States Securities and Exchange Commission (the "SEC") during the Relevant Period that the Company's internal controls were adequate to ensure the accuracy of the financial information publicly reported by the Company.

3.     Likewise, MS&B, the Company's outside auditor, issued "clean" audit opinions during the Relevant Period, indicating that the Company's publicly reported financial statements fairly reflected China Organic's financial condition in all material respects during the Relevant Period.

4.     In fact, the Company's internal controls were not adequate to ensure the accuracy of the publicly reported financial information during the Relevant Period and, as a consequence, China Organic's public filings contained materially false and misleading statements.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2).  Plaintiff and Defendants are citizens of difference states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.     Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b)(1) because the nominal defendant, China Organic, is incorporated in, and therefore a resident of, the State of Florida.

## PARTIES

### Plaintiff

7.     *Plaintiff Joseph M. Jason* is, and at all times relevant hereto was, a shareholder of China Organic.  Plaintiff will fairly and adequately represent the interests of the Company and its shareholders in enforcing the rights of the Company.  Plaintiff is a citizen of the State of Illinois.

### Nominal Defendant

8.     *Nominal Defendant China Organic Agriculture, Inc.* is a Florida corporation that maintains its principal executive offices at Dalian City, Zhongshan District, 105 Youhao Road Manhattan Building #1, Suite 1511, Dalian City, Liaoning Province, P.R. China. The Company through its main subsidiaries, is engaged in the distribution of agricultural products in China, including green rice, organic rice, soy beans, ice wine and other agricultural products.  In addition, China Organic is a party to a joint venture in China which intends to process grapes purchased from third parties to produce ice wine.

### Individual Defendants – Officers and Directors

9.     *Defendant Jinsong Li* was, during the Relevant Period, Chief Executive Officer (principal executive officer) of the Company.

10.     *Defendant Xuefeng Guo* was Chief Financial Officer (Principal Financial and Accounting Officer) of the Company until December 2008.

11.     **_Defendant Weihong Xia_** was, subsequent to December 2008, Chief Financial Officer (principal financial and accounting officer) of the Company since December 1, 2008. Xia also served was the Company's Secretary until January 2010.

12.     **_Defendant Guangwu Zhang_** ("Zhang") was, during the Relevant Period, a Director of the Company.

13.     **_Defendant Shuje Wu_** ("Wu") was, during the Relevant Period, a Director of the Company.

14.     **_Defendant Zhouzhe Jin_** ("Jin") was, during the Relevant Period, a Director of the Company.

15.     **_Defendant Ingyong Ma_** ("Ma") was, during the Relevant Period, a Director of the Company.

16.     Defendants identified in paragraphs 9 through 15 are collectively referred to herein as the "Individual Defendants."

**External Auditor**

17.     Defendant Morgenstern, Svoboda & Baer, CPA's, P.C. ("MS&B") served, at all relevant times, as the Company's independent registered public accounting firm.   MS&B maintains offices at 40 Exchange Place, Suite 1820, New York, NY 10005.

18.     Defendant David Svoboda ("Svoboda") is a certified public accountant licensed to practice in the State of New York.  Svoboda was a partner in MS&B, and was the engagement partner principally responsible for the audit of China Organic during the Relevant Period.  As engagement partner with MS&B, Svoboda had the authority to control the audit of China Organic, as well as the contents of MS&B's audit opinion.

19. The Individual Defendants, MS&B and Svoboda are collectively referred to herein as "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

20. Defendants Li, Guo and Xia, because of their positions of control and authority as officers of the Company, were able to and did, directly and indirectly, control or fail to control the wrongful acts complained of herein. Because of their executive positions with the Company, each of these defendants had access to adverse non-public information about the financial condition and operations of the Company, including, without limitation, the adequacy of the Company's internal financial controls.

21. At all material times hereto, defendants Li, Guo and Xia was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of said agency.

22. To discharge their duties, defendants Li, Guo and Xia were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial, business, and corporate affairs of the Company. By virtue of such duties, these defendants were required, among other things, to:

(a) Manage, conduct, supervise and direct the business affairs of the Company in accordance with the laws of the United States, the states and countries in which it conducted business, and the Company's charter and bylaws; and

(b) Implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to accurately report the Company's true financial condition in accordance with applicable federal and state laws, rules and regulations.

23.     Defendants Li, Guo and Xia further owed to China Organic the duty of loyalty, including the duty of candor, requiring full and accurate disclosure of the Company's true financial condition, including the adequacy of its internal controls.

24.     In addition, as part of the duty of loyalty owed to the Company, the Individual Defendants were required to preserve the assets of the corporation by, *inter alia*, enforcing the rights of the Company to recover damages caused to the corporation by the wrongful acts of others.

## SUBSTANTIVE ALLEGATIONS

25.     On November 12, 2008, the Company filed its 2008 third quarter Form 10-Q with the United States Securities and Exchange Commission (the "SEC"). In that Form 10-Q, the Company reported net income of $8,258,944 for the three months ending September 30, 2008, compared to net income for $7,228,015 for the three months ending September 30, 2007.

26.     In addition, in that 2008 third quarter Form 10-Q, China Organic reported that "[u]ntil the end of September 2008, the Company, through ErMaPao, was engaged mainly in the business of the production, processing and sale of rice. On September 29, 2008, the Company sold its interest in ErMaPao to Bothven Investments Limited, in a transaction which was completed October 7, 2008." The 2008 third quarter Form 10-Q further stated: "On September 30, 2008, the Company entered into a Stock Transfer Agreement with Bothven Investments Limited ("Bothven"), pursuant to which the Company agreed to sell to Bothven all of the shares of its subsidiary, Jilin Songyuan City ErMaPao Green Rice Limited ("ErMaPao"), for consideration of US $8,700,000. The sale was completed on October 7, 2008."

27.     The foregoing representations were materially false and misleading because Defendants failed to disclose that the Company had not yet received payment for the sale of

ErMaPao, and was carrying the $8,700,000 sales price as a receivable on its books. As disclosed by the Company on January 27, 2010, the sale was actually completed during the second half of 2009, at which time the $8,700,000 purchase price was finally remitted to the Company. The Company's September 30, 2008 financial statements were also materially false and misleading because they failed to report the operations of ErMaPao as discontinued operations.

28.     The third quarter 2008 Form 10-Q contained the following representation regarding the Company's changes in internal control over financial reporting:

> As reported in our Amendment No. 1 to our Quarterly Report on Form 10-Q for the period ended June 30, 2008, our internal controls over financial reporting were not effective as of the end of the period covered by that report. In order to further enhance our internal controls over financial reporting, we have implemented, in the financial quarter ended September 30, 2008, the following steps:
>
> -   we have established plans and procedures to ensure complete and timely audits on future acquisitions;
>
> -   we have increased the efficiency of the consolidation work regarding our parent company and subsidiaries' financial statements; preparation of these statements is now performed by accountants with greater GAAP familiarity. We have also changed our procedures to better ensure compliance with the SFAS rules;
>
> -   we have introduced practices wherein our accountants and finance associates process different aspects of our accounting duties, then perform cross-checks for completeness and improved error detection.
>
> We expect that these steps, when fully implemented, will further correct the material weaknesses described in Amendment No. 1 to our Quarterly Report on Form 10-Q/A for the period ending June 30, 2008. We do not believe that the costs of implementing these steps will have a material effect on our financial position, cash flow, or results of operations.
>
> During the fiscal quarter ended September 30, 2008, the foregoing were the only changes in our internal control over financial

reporting identified in connection with the evaluation performed during the fiscal year covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

29.     The third quarter Form 10-Q contained the following representation regarding the Company's evaluation of disclosure controls and procedures:

> As reported in Amendment No. 1 to our Quarterly Report on Form 10-Q for the period ending June 30, 2008, our disclosure controls and procedures were not effective as of the end of that period.
>
> Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q, and in consideration of the measures undertaken by the Company in response to the prior finding of ineffectiveness, *our principal executive officer and principal financial officer have concluded that its disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective* to ensure that information required to be disclosed by China Organic in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms and that such information is accumulated and communicated to its management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

30.     The foregoing statements were materially false and misleading because they failed to disclose that the Company's disclosure controls were not effective as of September 30, 2008 and, as a result of the deficiencies in its third quarter Form 10-Q, the Company was not considered to be current in its Exchange Act reporting and, accordingly, the Company would not be permitted to register its securities on certain Forms of registration statements.

31.     The 2008 third quarter Form 10-Q contained the November 4, 2008 report of MS&B, which stated:

> Board of Directors and Stockholders of China Organic Agriculture, Inc.

We have reviewed the accompanying consolidated balance sheets of China Organic Agriculture, Inc. as of September 30, 2008 and the consolidated statements of operations for the three and nine months ended September 30, 2008 & 2007 and consolidated statements of cash flows and shareholders' equity for the nine months then ended. These financial statements are the responsibility of the Company's management.

We conducted our review in accordance with standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements referred to above for them to be in conformity with accounting principles generally accepted in the United States of America.

We have previously audited, in accordance with auditing standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of China Organic Agriculture, Inc. as of December 31, 2007 and the related consolidated statements of income, retained earnings and comprehensive income, and consolidated statements of cash flows for the year then ended; and in our report dated March 26, 2008, we expressed an unqualified opinion on those financial statements. In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2007, is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

32.    The November 4, 2008 report of MS&B was materially false and misleading because MS&B did not conduct its review in accordance with standards of the Public Company Accounting Oversight Board (United States) and the Company's financial statements were not in conformity with accounting principles generally accepted in the United States of America.

MS&B read the financial statements and the notes thereto that appeared in the 2008 third quarter Form 10-Q and failed to identify the fact that the Company's:

(a)    Balance   Sheet   improperly   omitted   an   $8,700,000 receivable; and

(b)    financial statements, and the notes thereto, created the false impression that the ErMaPao sale had been consummated and completed on October 7, 2008.

33.    MS&B's review report stated that a review of interim financial information consists principally of applying analytical procedures to financial data and of making inquiries of persons responsible for financial and accounting matters.   It did not state that the reviews consisted exclusively of applying analytical procedures to financial data and of making inquiries of persons responsible for financial and accounting matters.

34.    If a review of interim financial statements were to consist solely of identification of questionable figures via analytical procedures followed by a blind reliance on the veracity of explanations provided by those responsible for the preparation of these financial statements, then a review would constitute nothing more than a perfunctory rubber-stamping of whatever management chose to publish and disseminate to the investing public.

35.    MS&B knew of the ErMaPao sale, the financial statement representation that it had been completed on October 7, 2008, and the fact that no consideration had yet been paid by Bothven.  MS&B therefore knew that the September 30, 2008 financial statements were required to disclose all material facts concerning the transaction, including the fact that the Company had deceptively led investors to believe that Bothven paid $8,700,000 by concealing the existence of an $8,700,000 receivable that was due from Bothven.

36.     On January 16, 2009, the Company filed a first amended 2008 third quarter Form 10-Q with the SEC.  This document contained the same information that was presented in the 2008 third quarter Form 10-Q as described above.  Accordingly, it was materially false and misleading for the same reasons that the 2008 third quarter Form 10-Q was materially false and misleading.   It also contained the materially false and misleading November 4, 2008 report of MS&B, as excerpted above.

37.     On April 15, 2009, the Company filed its 2008 Form 10-K with the SEC.  It disclosed the fact that the sale of ErMaPao to Bothven was not completed on October 7, 2008 as previously represented, because no consideration had passed hands:

> On September 30, 2008, the Company entered into a Stock Transfer Agreement with Bothven Investments Limited ("Bothven"), pursuant to which the Company agreed to sell to Bothven all of the shares of its subsidiary, Jilin Songyuan City ErMaPao Green Rice Limited ("ErMaPao"), for consideration of US $8,700,000. The sale was completed on October 7, 2008, although it has an effective date of September 30, 2008. As at December 31, 2008, the Company has received $0 from Bothven.

> *          *          *

> On March 18, 2009, Bothven signed the extension payment agreement with the Company and Bothven will pay the consideration of US $8,700,000 by 3 installments (i.e. 30% in July 2009, 30% in September 2009 and 40% in October 2009) before December 31, 2009.

38.     The Company's Statement Of Income for the year ended December 31, 2008, as contained in the 2008 Form 10-K, reflected a pre-tax income of $26,412,415 for the year.  This amount was materially overstated by $3,015,387, more than 11%. As subsequently admitted by China Organic, the Company incorrectly recorded a pre-tax and after-tax gain on debt conversion of $3,015,387 in its audited consolidated statement of income for the year ended December 31, 2008, initially included in its Annual Report on Form 10-K for the year ended December 31,

2008. The debt was incurred by Dalian Huiming Industry Ltd. prior to the Company's acquisition of 60% of the outstanding shares of Dalian Huiming and forgiven in December 2008. The Company subsequently determined that the debt forgiveness should have been considered as a reduction of the liabilities acquired at the date of the acquisition. As a result, Income Before Income Taxes From Continuing Operations and Net Income for the year ended December 31, 2008 should have been reported as $3,015,387 less than originally reported. As a result of this error, the Company's Retained Earnings and Stockholders' equity balances as of December 31, 2008 were overstated by $3,015,387. Likewise, the Goodwill originally recorded at the date of acquisition of the shares in Dalian Huiming was overstated by $3,015,387. In addition, the Company subsequently determined that certain amounts in the consolidated Cash Flow statements included in the 2008 Form 10-K related to the foregoing adjustment were misstated.

39. The 2008 Form 10-K contained a certification from MS&B dated April 6, 2009 which stated:

> Board of Directors and Stockholders of China Organic Agriculture, Inc.
>
> We have audited the accompanying consolidated balance sheets of China Organic Agriculture, Inc. as of December 31, 2008 and 2007, and the related consolidated statement of operations, shareholders' equity, and cash flows for each of the years in the two-year period ended December 31, 2008. China Organic Agriculture, Inc.'s management is responsible for these financial statements. Our responsibility is to express an opinion on these financial statements based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing

audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinions.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of China Organic Agriculture, Inc. as of December 31, 2008 and 2007 and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2008 in conformity with accounting principles generally accepted in the United States of America.

40.     The above excerpted audit opinion that was issued by MS&B (the "Unqualified Audit Opinion"), was materially false and misleading because the financial statements were not presented in accordance with U.S. Generally Accepted Accounting Principles ("GAAP"), nor were they audited in accordance with GAAS.

41.     GAAS (AU Section 411) describes: "The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles in the Auditor's Report." It states:

The auditor's opinion that financial statements present fairly an entity's financial position, results of operations, and cash flows in conformity with generally accepted accounting principles should be based on his judgment as to whether (a) the accounting principles selected and applied have general acceptance; (b) the accounting principles are appropriate in the circumstances; (c) the financial statements, including the related notes, are informative of matters that may affect their use, understanding, and interpretation . . .; (d) the information presented in the financial statements is classified and summarized in a reasonable manner, that is, neither too detailed nor too condensed . . .; and (e) the financial statements reflect the underlying events and transactions in a manner that presents the financial position, results of operations, and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practicable to attain in financial statements.

42.     As particularized above, the financial statements which were disseminated to the investing public as a component part of the 2008 Form 10-K was not presented "fairly . . . in conformity with generally accepted accounting principles" because the:

(a)     Accounting principles selected and applied in the preparation of the Company's financial statements did not have general acceptance.

(b)     Accounting principles which pervasively impacted the Company's financial statements were not appropriate in the circumstances.

(c)     Company's financial statements, including the related notes, were not informative of matters that affected their use, understanding, and interpretation.

(d)     Company's financial statements did not reflect the underlying events and transactions in a manner that presented the financial position and the results of operations within a range of acceptable limits that were reasonable and practicable to attain in financial statements.

43.     MS&B knew it was required to adhere to standards and principles of GAAS, including the requirement that its report state whether or not the financial statements complied in all material respects with GAAP.

44.     MS&B, in issuing its Unqualified Audit Opinions, as alleged herein, knew that by doing so it was engaging in a gross departure from GAAS, or issued such Unqualified Audit Opinions with reckless disregard for whether or not GAAS was being complied with.

45.     In the introductory portion of Accounting Series Release No. 173, the SEC made the following comments pertaining to economic substance:

Another problem . . . is the need for emphasizing the importance of substance over form in determining accounting principles to be applied to particular transactions and situations. In addition to considering substance over form in particular transactions, it is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

> We believe that the auditor must stand back from his resolution of particular accounting issues and assess the aggregate impact of the particular issues upon a reasonable investor's perception of the economic substance of the enterprise for which the financial statements are being presented.

46. As particularized above, due to the materially false and misleading accounting which permeated the Company's financial statements during the Class Period, a reasonable investor was unable to perceive the true economic condition of the enterprise for which the financial statements were being presented.

47. In opining on the fairness of the Company's financial statements during the Class Period, MS&B specifically represented that its audit included "assessing the accounting principles used . . . by management," as well as "evaluating the overall financial statement presentation." This representation was materially false and misleading because MS&B either failed to assess the propriety of the accounting principles used by the Company and, thus, failed to consider the Company's use of non-GAAP accounting, or did so in an egregiously reckless manner.

48. MS&B's Unqualified Audit Opinion, insofar as it stated that MS&B's audits of the Company's financial statements during the Class Period were conducted in accordance with GAAS, were false and misleading because the following GAAS (AU 150) were knowingly or recklessly violated:

(a) General Standard No. 1 was violated, which standard requires that the audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

(b)     General Standard No. 3 was violated, which standard requires that due professional care is to be exercised in the performance of the audit and in the preparation of the report.

(c)     Standard of Field Work No. 1 was violated, which standard requires that the work is to be adequately planned and assistants, if any, are to be properly supervised.

(d)     Standard of Field Work No. 2 was violated, which standard requires that a sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

(e)     Standard of Field Work No. 3 was violated, which standard requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination.

(f)     Standard of Reporting No. 1 was violated, which standard requires that the report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.

(g)     Standard of Reporting No. 3 was violated, which standard requires that informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

49.     The Company was required to appropriately report transactions in conformity with GAAP.  The Company failed to report transactions in the Company's financial statements in conformity with GAAP.  MS&B was, therefore, required pursuant to GAAS, to express a qualified opinion on the Company's financial statements (AU Section 508) and, in so doing, to disclose to the investing public the nature and extent of the Company's non-GAAP accounting.

For example, the Company's financial statements failed to disclose the Company's accounting policies with regard to the recognition of revenue, and MS&B failed to disclose these facts in qualified audit opinions on the Company's financial statements.

50.     MS&B violated GAAS in failing to express a qualified opinion on the Company's financial statements as of and for the year ended December 31, 2008.

51.     MS&B knew or recklessly disregarded the facts which indicated that the Company's financial statements discussed above and below were materially false and misleading for the reasons set forth above, and were presented in a manner which violated the principles of fair financial reporting and the GAAP specified herein.

52.     MS&B failed to comply with GAAS in that it failed to perform its audits of the Company's financial statements during the Class Period with a proper degree of professional skepticism (AU Section 316). In this regard, MS&B either identified and ignored evidence that the Company's financial statements were materially misstated due to fraudulent accounting, or recklessly failed to identify such fraudulent accounting.  For example, MS&B either identified and ignored or recklessly failed to identify the $3,015,387 income overstatement in the Company's financial statements as of and for the year ended December 31, 2008. Accordingly, MS&B's 2008 audit was so deficient that it amounted to no audit at all.

53.     Had MS&B undertaken the performance of those audit procedures which were required by GAAS, and with the due professional care which was required by GAAS, it would have known that the Company's financial statements as of and for the year ended December 31, 2008 was materially false and misleading because these financial statements reflected materially misstated earnings and net worth and were not presented in accordance with GAAP.  In reckless

disregard of professional standards, MS&B failed to audit the Company's financial statements during the Class Period in conformity with GAAS.

54.    In addition, MS&B either knew, or recklessly disregarded, that each of the financial statements discussed above and in the paragraphs below which were disseminated to the investing public during the Class Period failed to disclose material facts that were necessary in order to make these financial statements, in light of the circumstances, not misleading.

55.    GAAS provides that the auditor should:

(a)    Identify areas that may need special consideration.

(b)    Assess conditions under which accounting data are produced, processed, reviewed, and accumulated within the organization.

(c)    Evaluate the reasonableness of estimates, such as valuation of inventories . . . [and] allowances for doubtful accounts.

(d)    Evaluate the reasonableness of management representations.

(e)    Make judgments about the appropriateness of the accounting principles applied and the adequacy of disclosures.

56.    MS&B either failed to:

(a)    Identify areas that needed special consideration (such as the Company's revenue recognition policies and practices) or identified such areas and audited them in a manner which was so deficient that it amounted to no audit at all, while making audit judgments that no reasonable auditor would have made if confronted with the same facts.

(b)    Assess the conditions under which accounting data was produced, processed, reviewed, and accumulated within the organization or assessed such

conditions and made audit judgments based upon said assessment that no reasonable auditor would have made if confronted with the same facts.

(c)     Judge the appropriateness of the accounting principles applied (such as those employed by the Company to recognize revenue) and the adequacy of disclosures in the Company's financial statements, or did so and arrived at judgments that no reasonable auditor would have arrived at if confronted with the same facts.

57.     GAAS (AU 316) states that a fraudulent financial reporting risk factor is the occurrence of "[S]significant, unusual, or highly complex transactions, especially those close to year end, that pose difficult `substance over form' questions." The transaction giving rise to the $3,015,387 income overstatement was such an occurrence. MS&B was reckless in ignoring this fraudulent financial reporting risk factor.

58.     On April 29, 2009, the Company filed a second amended 2008 third quarter Form 10-Q with the SEC. This document contained the same information that was presented in the 2008 third quarter Form 10-Q as described above. Accordingly, it was materially false and misleading for the same reasons that the 2008 third quarter Form 10-Q was materially false and misleading. In addition, it contained the materially false and misleading November 4, 2008 report of MS&B, as excerpted above.

59.     The second amended 2008 third quarter Form 10-Q, which reflected ErMaPao & Yutian as discontinued operations, contained a Statement Of Income which reflected the composition of net income as follows:

|  | THREE MONTHS ENDED SEPTEMBER 30, 2008 |
|---|---|
| Sales | $ 46,454,286 |
| Cost of sales | ($35,326,386) |
| Gross profit | $11,127,900 |

| Selling, general and administrative expenses | ($235,687) |
|---|---|
| Income from operations | $10,892,213 |
| Gain on debt conversion | $432,169 |
| Other (expense)/income | -- |
| Interest expense | ($79,570) |
| Income before income taxes from continuing operations | $11,244,812 |
| Provision for income taxes | ($2,773,251) |
| Net income from continuing operations | $8,471,561 |
| Discontinued operations, net of tax | |
| Income from ErMaPao, net of tax | $93,880 |
| Income due to disposal of ErMaPao, net of tax | $934,194 |
| Net income from discontinued operations | $1,028,074 |
| Net Income | $ 9,499,635 |

60.     The reason for the $1,240,691 increase in reported net income (from $8,258,944

as initially presented, to $9,499,635 as presented in the second amended 2008 third quarter Form

10-Q) was not explained.   If the revised financial statements were intended to present the

discontinued operations as a separate line item, then regardless of the breakdown of the numbers,

the total $8,258,944 net income figure which was reflected in the 2008 third quarter Form 10-Q

net income should have remained the same.

61.     On May 26, 2009, the Company filed its 2009 first quarter Form 10-Q with the

SEC.   It was materially false and misleading because it incorporated the 2008 Form 10-K by

reference and because it presented the materially false and misleading December 31, 2008

Balance Sheet and Statement of Income alongside the March 31, 2009 financial figures for

comparative purposes.

62.     On December 3, 2009, the Company posted a December 2, 2009 letter to William

Thompson, Accounting Branch Chief at the SEC Division of Corporation Finance on the SEC

EDGAR website.   It stated in relevant part:

> The previously consolidated statements of income and cash flows
> included in the amendment to the Company's Form 10-Q for the
> quarter ended September 30, 2008 filed on April 29, 2009 were
> revised as a result of the disposition of ErMaPao during the third

quarter of 2008 to reflect as a separate line item the operations of
ErMaPao as a discontinued operation. The amendment was
prepared to address certain other issues relating to the financial
statements included in the Form 10-Q for that quarter. Although a
separate Item 4.02 Form 8-K was not filed at that time, the
Company's accounting staff concluded that reference to the
correction should be included in the Item 4.02 Form 8-K relating to
the financial statements included in its Form 10-K for the year
ended December 31, 2008 and its Form 10-Q for the quarter ended
March 31, 2009.

The consolidated financial statements included in the Company's
Form 10-Q for the quarter ended September 30, 2008, as originally
filed, reflected the results of ErMa-Pao as part of ongoing
operations despite the fact that, as indicated in the Report, ErMa-
Pao had been sold as of September 30, 2008. The financial
statements included in an amended Form 10-Q for the quarter
ended September 30, 2008, filed on April 29, 2009, to address
other issues relating to the financial statements for that quarter,
gave effect to the sale of ErMa-Pao. A description of the error
relating to the original treatment of the sale of ErMa-Pao was not
included in an Item 4.02 Form 8-K because the Company believed
this error did not render the originally filed financial statements
misleading. Nevertheless, when it filed the April 29, 2009,
amendment, the Company determined that it was appropriate to
conform to the treatment of the results for ErMa-Pao suggested by
the staff in its earlier comment letter.

*        *        *

The purchase agreement with respect to Dalian Huiming Industry
Ltd. presumed that all debt would remain outstanding and thus, at
the time of the acquisition of Dalian Huiming, the debt remained
upon the books of the acquired entity. Two months later,
following further investigation of events incident to the acquisition
by the Company's financial staff, the staff was advised that the
debt had been forgiven and accordingly treated it as income. It
subsequently has come to the attention of the Company's financial
staff that in a supplemental letter entered into at the time of the
purchase agreement, it was agreed that the debt was to be forgiven
at the time of closing. Accordingly, the Company has concluded
that the amount previously reported as gain from the forgiveness of
the debt should be treated effectively as a reduction of the purchase
price. A copy of the supplemental letter written in Chinese and an
English translation of that supplemental letter is being submitted
with this letter. Under SFAS 141, paragraph F1, an acquiring party

has a one-year period to determine the proper accounting treatment of items of the acquired entity on its financial statements.

\* \* \*

The date upon which the board of directors concluded that the previously issued financial statements should no longer be relied upon has been disclosed in response to this comment. The date of the unaudited consolidated financial statements referred to in the second paragraph under the March 31, 2009 subheading has been revised to refer to the quarterly period ended March 31, 2009 in response to this comment.

63.     Also, on December 3, 2009, the Company filed a Form 8-K with the SEC which advised the investment community that "on November 20, 2009, the board of directors concluded that the consolidated financial statements as of and for the three and nine month periods ended September 30, 2008, contained in the 2008 Third Quarter Form 10-Q could no longer be relied upon due to the need to adjust for the manner in which the results of ErMaPao were reported."

64.     The December 3, 2009 Form 8-K also stated that "on November 20, 2009, the Company's board of directors concluded that the Company's consolidated financial statements as of and for the year ended December 31, 2008, which were included in the 2008 Form 10-K, as well as its unaudited consolidated financial statements as of and for the quarterly period ended March 31, 2009, which were included in the 2009 First Quarter Form 10-Q, could no longer be relied upon due to the need to make the adjustments." The adjustments that were required were explained as follows:

The Company incorrectly recorded a gain on debt forgiveness of $3,015,387 in its audited consolidated statement of income for the year ended December 31, 2008, initially included in its Annual Report on Form 10-K for the year ended December 31, 2008 ("2008 Form 10-K"). The debt was originally incurred as a Payable to a related party (a shareholder of Dalian Huiming) by Dalian Huiming Industry Ltd. prior to the Company's acquisition

of 60% of the outstanding shares of Dalian Huiming and formally forgiven in December 2008 based on an agreement previously made as part of the purchase arrangements. Based upon a review of its accounting records and the literature applicable to the transactions, the Company has determined that the related debt should have not have been given any value as of the date of the purchase of the Dalian Huiming shares and thus its formal forgiveness should not have been subsequently treated as a gain. As a result, Income Before Income Taxes From Continuing Operations and Net Income for the year ended December 31, 2008 should have been reported as $3,015,387 less than originally reported. In addition, the Company has determined that certain amounts in the consolidated cash flow statements included in the 2008 Form 10-K related to the foregoing adjustment were misstated.

\*        \*        \*

As a result of the adjustment to the Company's financial statements as of December 31, 2008, noted above, Goodwill recorded at the date of acquisition of the shares in Dalian Huiming and Retained Earnings at March 31, 2009 as reflected in the Company's Consolidated Balance Sheet included in its Quarterly Report on Form 10-Q for the first fiscal quarter of 2009 (the "2009 First Quarter Form 10-Q") should be decreased by a corresponding amount.

65.    On January 27, 2010, the Company filed a third amended Form 10-Q for the quarterly period ended September 30, 2008. It disclosed, for the first time, that the Company's CEO and CFO had concluded that the Company's Disclosure Controls were not effective as of September 30, 2008 and that, as a result of the deficiencies in certain of its filings, the Company is would not be permitted to register its securities on certain Forms of registration statements:

We maintain "disclosure controls and procedures," as such term is defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act"), that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely

decisions regarding required disclosure. We conducted an evaluation (the "Evaluation"), under the supervision and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of the design and operation of our disclosure controls and procedures ("Disclosure Controls") as of September 30, 2008 pursuant to Rule 13a-15 of the Exchange Act. Based on this Evaluation, our CEO and CFO concluded that our Disclosure Controls were not effective as of September 30, 2008. The primary deficiency in our disclosure controls and procedures is our failure to adopt written policies and procedures to direct our personnel to advise our management of events and information to enable them to make timely decisions regarding required disclosure. This deficiency is due, in part, to the lack of experience of our management personnel in China with the rules and regulations of the Securities and Exchange Commission and, more generally, western business procedures, and the failure of our personnel in China to timely communicate with the Company's representatives in the United States. This absence of procedures has resulted in a number of late filings and in the receipt by the Company of a number of requests for amendments and additional information from the Staff of the Securities and Exchange Commission.

During 2008, the Company engaged within the US an individual familiar with the requirements of US securities laws and accounting regulations. This individual was engaged as a consultant, and coordinated between the Company's Chinese representatives and its counsel and accountants in the United States. He also provided us with procedures intended to heighten management's awareness of the need to comply with US securities laws and thereby improve our disclosure controls and procedures. In addition, we have engaged an individual in the US familiar with public accounting and the controls and procedures needed by a public company to advise us as we upgrade our internal controls. In December 2009 we engaged an individual to help establish a systematic approach we can follow to establish appropriate controls and procedures throughout our company. The Company is in the early stages of preparing an internal control matrix to document its controls and procedures which it plans to utilize to test the effectiveness of its controls and procedures. We have not completed all steps necessary to insure that our disclosure controls and procedures are effective. Our efforts to adopt and implement appropriate disclosure controls and procedures are ongoing and are intended to ensure that we have appropriate disclosure controls and procedures by the end of 2010.

As a result of the deficiencies in certain of its filings under the Exchange Act which we are in the process of rectifying, the Company is not considered to be current in its Exchange Act reporting.

As a result of its not being timely in its Exchange Act reporting, the Company will not be permitted to register its securities on certain Forms of registration statements until the Company is deemed timely in its Exchange Act reporting and satisfies all other criteria necessary for such registration statements. Until such time, the Company's shareholders will also be prevented from utilizing the provisions of Rule 144 to facilitate the sale of the Company's restricted stock.

66.     On January 27, 2010, the Company filed a first amended 2008 Form 10-K to, among other things, correct a material overstatement of income.  It stated:

Special Note Regarding Unresolved Comments

The Securities and Exchange Commission ("SEC") has requested that the Company file amendments to certain of its previous filings to clarify or enhance certain of the disclosures contained therein or to conform with the applicable filing requirements.  It remains the Company's desire to continue to have its securities trade in the over-the-counter bulletin board and to eventually trade on NASDAQ or another exchange.  The Company intends to respond to the comments raised by the Staff and, to the extent necessary, to amend or supplement reports previously filed with the SEC.

*          *          *

Restatement and Reclassification

The Company has restated its consolidated financial statements of the period ended December 31, 2008 to correct the following errors in the consolidated financial statements previously filed:

The Company incorrectly recorded a pre-tax and after-tax gain on debt conversion of $3,015,387 in its audited consolidated statement of income for the year ended December 31, 2008, initially included in its Annual Report on Form 10-K for the year ended December 31, 2008 ("2008 Form 10-K").  The debt was incurred by Dalian Huiming Industry Ltd. prior to the Company's acquisition of 60% of the outstanding shares of Dalian Huiming and forgiven in December 2008. Based upon a review of its records and the

literature applicable to the transactions, the Company determined that the debt forgiveness should have been considered as a reduction of the liabilities acquired at the date of the acquisition. As a result, Income Before Income Taxes From Continuing Operations and Net Income for the year ended December 31, 2008 should have been reported as $3,015,387 less than originally reported. As a result of this error, the Company's Retained earnings and Stockholders' equity balances as of December 31, 2008 were overstated by $3,015,387. Correspondingly the Goodwill originally recorded at the date of acquisition of the shares in Dalian Huiming was overstated by $3,015,387. In addition, the Company has determined that certain amounts in the consolidated Cash Flow statements included in the 2008 Form 10-K related to the foregoing adjustment were misstated.

67.    On March 24, 2010, the Company filed a first amended Form 10-Q for the quarterly period ended March 31, 2009 with the SEC which contained restated financial statements.  Explaining the restatement, the first amended Form 10-Q for the quarterly period ended March 31, 2009 stated:

The Company has restated its consolidated financial statements of the period ended March 31 2009 to correct the following errors in the consolidated financial statements previously filed:

The Company incorrectly recorded a pre-tax and after-tax gain on debt conversion of $3,015,387 in its audited consolidated statement of income for the quarter ended March 31, 2009, initially included in its Annual Report on Form 10-Q for the quarter ended March 31, 2009 ("2009 Form 10-Q").  The debt was incurred by Dalian Huiming Industry Ltd. prior to the Company's acquisition of 60% of the outstanding shares of Dalian Huiming and forgiven in December 2008. Based upon a review of its records and the literature applicable to the transactions, the Company determined that the debt forgiveness should have been considered as a reduction of the liabilities acquired at the date of the acquisition. As a result, Income Before Income Taxes From Continuing Operations and Net Income for the year ended March 31, 2009 should have been reported as $3,015,387 less than originally reported. As a result of this error, the Company's Retained earnings and Stockholders' equity balances as of March 31, 2009 were overstated by $3,015,387. Correspondingly the Goodwill originally recorded at the date of acquisition of the shares in Dalian Huiming was overstated by $3,015,387. In addition, the Company has determined that certain amounts in the consolidated Cash Flow

statements included in the 2009 Form 10-Q related to the foregoing adjustment were misstated.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

68.     Plaintiff brings this action derivatively on behalf of the Company to redress injuries suffered by the Company as a direct and proximate result of the Individual Defendants' conduct. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

69.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting the Company's rights.

70.     China Organic is incorporated in Florida.  Under Florida law, "[a] complaint in a proceeding brought in the right of a corporation must . . . allege with particularity the demand made to obtain action by the board of directors and that the demand was refused or ignored by the board of directors for a period of at least 90 days from the first demand unless, prior to the expiration of the 90 days, the person was notified in writing that the corporation rejected the demand." Fla. Stat. § 607.07401(2).

71.     On December 5, 2012, Plaintiff Jason, through his counsel, served China Organic's registered agent in Florida with a written demand, dated December 5, 2012 (copy annexed hereto as Ex. B), that:

> China Organic's Board of Directors "(the "Board") immediately commence litigation on behalf of the Company against Jinsong Li ("Li"), Xuefeng Guo ("Guo"), and Weihong Xia ("Xia") and any other appropriate China Organic directors and officers for breaches of fiduciary duty and securities fraud in connection with their activities as directors and officers of the Company.  In addition, this letter serves as a formal demand pursuant to Fla. Stat. § 607.07401 that the Board immediately commence litigation on behalf of the Company against Morgenstern, Svoboda & Baer, CPA's, P.C. ("MS&B") and David Svoboda ("Svoboda"), as well as any appropriate partners and employees thereof for professional negligence, malpractice, and other appropriate causes of action in connection with its services as China Organic's principal accountant.

72.     The demand letter further stated:

As described in the Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint" (copy attached hereto)) filed in the matter styled *In re China Organic Securities Litigation*, C.A. No. 11 Civ. 8623 (JMF) (S.D.N.Y.) (the "Federal Securities Action"), MS&B and Svoboda, who served as the Company's outside auditor and the then-MS&B engagement partner primarily responsible for the audit of the Company, respectively, engaged in conduct violating Section 10(b) of the Securities Exchange Act (the "Act"), 15 U.S.C. § 78j, Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Act, 15 U.S.C. § 78t during the period November 12, 2008 and May 17,2011, inclusive (the "Class Period").

The Complaint asserts, among other things, that during the Class Period:

> MS&B failed to perform audit and review services for China Organic in accordance with the standards of the PCAOB and U.S. Generally Accepted Auditing Standards ("GAAS") and China Organic's financial statements were not presented in accordance with U.S. Generally Accepted Accounting Principles ("GAAP"). Most notably, MS&B failed to maintain quality control sufficient to ensure technical competence and the exercise of due care or professional skepticism in performing audit and review services for China Organic. Nevertheless, MS&B issued clean -- unqualified – audit opinions on China Organic's financial statements to be disseminated to the investing public, including China Organic's financial results reported in the Company's 2008 annual report on Form 10-K ("2008 10-K") which overstated the Company's pre-tax income by 11%. MS&B further issued unaudited review reports for the Company's quarterly reports which materially misstated China Organics financial results and misrepresented the Company's internal financial controls and controls over financial reporting. In essence, MS&B served as little more than a rubber stamp for China Organic, which served to provide the Company with access to the U.S. capital markets.

Complaint, ¶ 7.  As a consequence:

> China Organic was forced to amend its 2008 third quarter Form 10-Q ("3Q 2008 10-Q"), for which MS&B issued a review report, three times to correct the financial results reported therein and admit that the Company lacked internal financial controls and controls over financial reporting. Moreover, China Organic was compelled to further admit that the Company's consolidated financial statements as of and for the year ended December 31,

2008, which were included in the 2008 Form 10-K for which MS&B issued an unqualified audit opinion, as well as its unaudited consolidated financial statements as of and for the quarterly period ended March 31, 2009 for which MS&B again issued a review report, which were included in the 2009 First Quarter Form 10-Q, could no longer be relied upon due to the need to make the adjustments.

Finally, on May 17,2011, after the restatements and amendments set forth above and multiple changes in auditors and chief financial officers, China Organic announced that it would be filing its Form 10-Q five (5) days late and falsely and misleadingly led the market to believe that it would ultimately be in compliance with Exchange Act reporting requirements. In fact, the Company failed to make the requisite filings, and was unable to ever file another annual report on Form 10-K or otherwise disseminate audited financial results. As a result, unsuspecting investors watched the price of China Organic's common stock drop to under $0.01 per share from a Class-Period high of$1.45.

*Id.*, ¶¶ 8-9.

Plaintiffs in the Federal Securities Action did not name Li, Guo and Xia as defendants. These individuals, however, served as Chief Executive Officer and Chief Financial Officers of the Company during the Class Period. As such they were responsible for review and approval of China Organic's publicly filed financial statements. By approving the materially false and misleading public filings identified in the Complaint in the Federal Securities Action, these individuals breached the fiduciary duties they owed to China Organic. *See Cohen v. Hattaway*, 595 So. 2d 105, 107 (Fla. 5th DCA 1992) (under Florida law, "[c]orporate directors and officers owe a fiduciary obligation to the corporation and its shareholders and must act in good faith and in the best interest of the corporation.").

Similarly, MS&B was China Organics principal accountant during most of the Class Period. MS&B issued a "clean" audit opinion for the year ended December 31, 2008, and reviewed the Company's financial statements for the quarter ended March 31, 2009. During this time, Svoboda was the engagement partner on the China Organic audit, with primary responsibility for the conduct of such audit. As indicated in the Federal Securities Action, the actions of MS&B and Svoboda are alleged to be fraudulent. At bare minimum, their actions constitute professional negligence. *See Sure Snap Corp. v. Baena,* 705 So.2d 46, 48-49 (Fla. 3d DCA 1997) (a cause of action for professional malpractice has three elements: (1) employment; (2) neglect of a reasonable duty; and (3) the negligence resulted in and was the proximate cause of loss to the client) (quoting *Bolves v. Hullinger,* 629 So.2d 198, 200 (Fla. 5th DCA 1993)).

As a consequence of these actions, China Organic has been harmed to the extent that it may be subject to litigation brought by governmental authorities or private persons or entities.  In addition, the Company's reputation has been severely damaged. The Company has also wasted a substantial amount of money in compensation and benefits paid to Li, Guo and Xia.  Its market capitalization has been severely diminished, and its ability to raise equity in the future severely undermined.  All of this substantial damage stems proximately from Li, Guo, and Xia's breaches of fiduciary duty, abuse of control, gross mismanagement, unjust enrichment, and waste of company assets in connection with their activities as directors and officers of the Company, as well as from MS&B's and Svoboda's professional negligence, malpractice, and potentially fraudulent activity.

By reason of their positions as officers and fiduciaries of China Organic, and because of their ability to control the business and corporate affairs of the Company, Li, Guo and Xia owed China Organic and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  Li, Guo and Xia were and are required to act in furtherance of the best interests of China Organic and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each officer of the Company owes to China Organic and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

Li, Guo and Xia because of their positions of control and authority as officers of China Organic, were able to and did, directly and/or indirectly, consciously commit and/or exercise control over the wrongful acts complained of herein.  Because of their executive and managerial positions with China Organic, each of them had knowledge of material non-public information regarding the Company.

For the reasons described above, Li, Guo and Xia all breached their fiduciary duties, abused their control, engaged in gross mismanagement, were unjustly enriched, and wasted company assets in connection with their activities as officers of the Company, all of which caused substantial harm to the Company and its shareholders.

*       *       *

Please be advised that the failure to take all of the actions demanded will result in the institution of litigation on behalf of the Company in accordance with the laws of the State of Florida.

73.     Plaintiff has received no communications from China Organic in response to his first demand.  The 90 day period from the date of the demand has run, and Plaintiff Jason's demand has been ignored by China Organic's Board.  As a result, demand is futile pursuant to Fla. Stat. § 607.07401(2).

**FIRST CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(Against All Individual Defendants)**

74.     Plaintiff incorporates by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

75.     The Individual Defendants all owed a fiduciary duty to China Organic and its stockholders, the duty to exercise loyalty, good faith, due care, candor, and diligence in the management and administration of the affairs of the Company, as well as in the auditing and reporting of the Company, and owed the duty of full and candid disclosure of all material facts thereto.

76.     As fiduciaries, to discharge these duties, the Individual Defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of China Organic.

77.     In performing the aforementioned services, the Individual Defendants all breached, and continue to breach, their fiduciary duties, causing damages to China Organic, by, *inter alia*, (i) failing to commence litigation against, or take any other action to recover from, Defendants Li, Guo and Xia for their failure to properly implement, oversee and maintain appropriate and adequate internal controls, practices and procedures for China Organic; (ii) failing to commence litigation against, or take any other action to recover from MS&B and David Svoboda, as well as any appropriate partners and employees thereof for professional negligence, malpractice, and other appropriate causes of action in connection with the services

MS&B provided as China Organic's principal accountant; and (iii) failing to ensure that China Organic operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information.

78.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly protect the interests of Defendants Li, Guo, Xia, MS&B and Svoboda, at the expense of the Company and was made without any reasonable efforts to ensure the Company's interests were protected.

79.     The Individual Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, China Organic to suffer substantial monetary damages as a result of the wrongdoing herein, as well as further and even greater damage in the future, including damage to China Organic's reputation and good will, the resulting loss of business and business opportunities, increased costs of capital, and otherwise.

80.     China Organic has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.

81.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

### SECOND CAUSE OF ACTION
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Defendants MS&B and Svoboda)

82.     Plaintiff incorporates by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

83.     As China Organic's auditor during the Relevant Period, Defendant MS&B knew that Defendants Li, Guo and Xia, as Company officers, owed fiduciary duties to the Company. Likewise, as the engagement partner at MS&B during the time that MS&B provided audit and review services to China Organic, Defendant Svoboda was also aware that Defendants LI, Guo and Xia owed fiduciary duties to China Organic.

84.     Defendants MS&B and Svoboda also knew that the Individual Defendants Li, Guo and Xia had breached those duties by making materially false and misleading statements in the Company's public filings during the Relevant Period, including, among other things, misrepresentations concerning the purported consummation of the sale of ErMaPao, the adequacy of the Company's internal controls, and the incorrectly recorded a pre-tax and after-tax gain on debt conversion of $3,015,387 in connection with Dalian Huiming Industry Ltd.

85.     Despite the foregoing, MS&B issued a "clean" audit opinion, dated April 6, 2009, that was approved by Defendant Svoboda and incorporated into the Company's 2008 Form 10-K representing that the Company's consolidated financial statements "present fairly, in all material respects, the financial position of China Organic Agriculture, Inc. as of December 31, 2008 and 2007 and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2008 in conformity with accounting principles generally accepted in the United States of America."

86.     Defendants MS&B and Svoboda knew that such opinion would be, and was, relied upon by the Company's shareholders in assessing the financial condition of the Company. Furthermore, Defendants MS&B and Svoboda knew that the inclusion of materially false and misleading statements in the Company's 2008 Form 10-K exposed the Company to regulatory scrutiny and possible sanctions, as well as costs associated.

87.     Defendants MS&B and Svoboda aided and abetted the Defendants' Li, Guo and Xia breach of their fiduciary duties in order to receive lucrative fees in exchange for rendering the "clean" audit opinion.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

A.      Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' conscious and willful breaches of fiduciary duties and other wrongdoing;

B.      Against MS&B and Svoboda and in favor of the Company for the amount of damages sustained by the Company as a result of MS&B's and Svoboda's aiding and abetting the Defendants' Li, Guo and Xia in the conscious and willful breaches of the fiduciary duties that Li, Guo and Xia owed to the Company;

C.      Directing China organic to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

D.      Awarding to China Organic restitution from MS&B and Svoboda, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by MS&B and Svoboda;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury for all causes and issues so triable.

Dated:  April 1, 2013.

**BARKER, RODEMS & COOK, P.A.**

Chris A. Barker, Esquire
Florida Bar No.  885568
501 East Kennedy Boulevard, Suite 790
Tampa, FL  33602
Tel.:  (813) 489-1001
Fax:  (813) 489-1008
Email: CBarker@barkerrodemsandcook.com

**GAINEY MCKENNA & EGLESTON**
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email gegleston@gme-law.com

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Olga A. Pettigrew
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rigrodskylong.com
Email: tjm@rigrodskylong.com
Email: oap@rigrodskylong.com

*Attorneys for Plaintiff*

## VERIFICATION

I, JOSEPH M. JASON, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of China Organic Agriculture, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of China Organic Agriculture, Inc. common stock at all relevant times.

3/25/2013
Date

_____
Name